UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| TERESA CURRAN, | ) | CIV.  05-5065-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER AFFIRMING THE |
| | ) | COMMISSIONER'S DECISION |
| JO ANNE B. BARNHART, | ) | |
| Commissioner, Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Teresa Curran, moves for reversal of the Commissioner of Social Security's decision denying her application for disability insurance benefits under Title II of the Social Security Act.  Defendant opposes the motion.  The court affirms the Commissioner's decision denying benefits.

**PROCEDURAL BACKGROUND**

Curran's application for Social Security Disability Insurance Benefits was filed under Sections 216(I) and 223 of the Social Security Act, 42 U.S.C. §§ 401-403.  Curran alleged a disability onset date of April 25, 2002.  Her application was denied both initially and upon reconsideration.  Curran requested and was granted a hearing before an Administrative Law Judge (ALJ).  The ALJ issued a decision finding Curran not disabled and finding that she had the residual functional capacity (RFC) to perform a range of sedentary

work.  The Appeals Council denied Curran's request for a review of the decision.  The ALJ decision is therefore the final decision of the Commissioner. This appeal followed.

## FACTUAL BACKGROUND

Curran was born on March 8, 1963.  She is a high school graduate and has one year of college training as a human services technician.  (AR. 75)  She has worked a variety of jobs, most recently as a saw mill worker, but also as a gas station cashier, a motel night auditor, a motel clerk, a nurse's assistant, and a restaurant cook.  (AR. 70)  As a saw mill worker, she performed a number of tasks, including the operation of heavy equipment, movement of product throughout the mill, and cleanup.  (AR. 70)  She lives in Spearfish, South Dakota.

Curran's alleged disability stems from pain she experienced beginning in the latter half of 2001.  Curran first reported that she was experiencing pain on the left side of her chest on September 21, 2001.  (AR. 188)  She was initially treated by Dr. Forrest S. Brady, who prescribed Vioxx to treat what he found as a "very localized tenderness" in a "very localized area in the left anterior lower chest."  (AR. 188)  When Vioxx was unsuccessful, Curran was prescribed Ibuprofen.  (AR. 187)

Her treating physician noted that Curran's symptoms were consistent with costochondritis.  (AR. 187)  Costochondritis is an inflammation that

2

occurs where the bone and cartilage come together in the rib cage. (AR. 291)
The condition is generally temporary, with symptoms normally subsiding
within two to six weeks.  (AR. 291)

The condition was evidently aggravated on September 21, 2001, when
Curran was shoveling wet sawdust at the mill in her work as part of the clean
up crew.  (AR. 165)  While shoveling, she reported feeling sharp stabbing pains
in her chest. (AR. 165)  She began to see primary care physician, Dr. Warren
Golliher, on October 9, 2001.  (AR. 187)  Dr. Golliher also found that the pain
Curran was experiencing was due to costochondritis.  (AR. 186)

Curran remained working at the saw mill through the end of 2001 and
part of 2002.  During that time Curran continued to see Dr. Golliher and
logged approximately 22 separate visits through November 12, 2002.  (AR. 334)
Dr. Golliher attempted a variety of treatments after Vioxx and Ibuprofen proved
unsuccessful, including anti-inflammatory medications and the administration
of anti-inflammatory injections.  (AR. 185)

On April 26, 2002, Curran reported that she did not want to work
because of the severity of her pain and was given the remainder of the week off.
(AR. 177)

Curran was referred to Dr. Mark Simonson in May of 2002.  (AR. 138)
Curran indicated to Dr. Simonson that the pain was radiating outward from
her chest when it flared up.  (AR. 138)  She also indicated that she needed to

3

lie down frequently to relieve the pain.  (AR. 138)  Dr. Simonson noted that Curran's pain appeared to be costochondral as well as sternocostal.  (AR. 139) Dr. Simonson prescribed physical therapy, a TENs unit, and a Lidoderm patch. (AR. 139)  He also took her off work for a three-week period until she could return for a reassessment.  (AR. 139)  Curran did not subsequently return to work.[1]

In June of 2002, Dr. Simonson ordered blood work of Curran as well as a CT scan and a thoracic spine MRI.  (AR. 135-37)  The results of these tests failed to reveal any objective abnormality, and Dr. Simonson noted "I'm not sure where to go with this."  (AR. 135)  Curran continued to report pain in her upper left chest, and Dr. Simonson referred her to surgeon Dr. Julie Raymond for an assessment.

In August of 2002, Dr. Raymond examined Curran and was unable to detect any physical abnormality.  (AR. 257)  At Dr. Raymond's direction, a whole body bone scan was performed of Curran.  (AR. 260)  This too indicated no relevant physical abnormality, and Dr. Raymond was unable to offer any further suggestions to improve Curran's condition.  (AR 257-58)  In the latter part of 2002, Curran also saw chiropractor Dr. Michael Weber.  (AR. 140-167)

---

[1]There is a slight discrepancy in the record regarding Curran's subsequent work.  The FICA tax records indicate Curran had $20,919.33 of income in 2001, $5,858.94 in 2002, and $480.84 in 2003. (AR. 54) When asked about the 2003 income at the ALJ hearing she stated "I think it was just the way the last day of work – it fell that – like that."  (AR. 392)

Although he used a variety of techniques in an attempt to relieve Curran's pain, including stretching, heat treatment, and ultrasound, after two months of treatment Dr. Weber noted that the original pain continued to return and he discontinued treatment.  (AR. 140)

In October of 2002, Curran began seeing Dr. Richard Russell, a pain specialist and anesthesiologist.  Curran continued to suffer from pain in her upper chest, but she also reported that tenderness had spread around her left side and to her back.  (AR. 226)  Dr. Russell prescribed Neurontin which provided some relief for Curran's pain.  (AR. 221)  Dr. Russell struggled throughout the early part of 2003 to find the correct dosage level of Nuerontin, as he felt that course of treatment had the highest chance of success.  (AR. 217)  In May of 2003, still having difficulty treating Curran's pain, Dr. Russell suggested a treatment of radio frequency stimulation to the affected areas. (AR. 213)  The first of these treatments was performed in July of 2003.  (AR. 208)  In August of 2003, Dr. Russell indicated that the treatment had resulted in some success. (AR. 206)  A similar procedure was performed in September of 2003 on a different area of Curran; however, this second procedure did not result in a decrease in pain.  (AR. 201, 199)  Dr. Russell then referred Curran to Dr. Craig Mills for a neurological consultation, for what Dr. Russell described as a "puzzling and difficult to treat chest wall pain syndrome."  (AR. 199)  After examining Curran and reviewing the wide range of treatments that

5

had been tried without success, Dr. Mills noted that he did not "have anything significantly enlightening to add to her treatment course." (AR. 196)

On January 12, 2004, Curran underwent an independent medical evaluation by Dr. Wayne J. Anderson on behalf of the worker's compensation insurer and in response to a claim that she had filed. (AR. 261-76) Dr. Anderson found that the work injury Curran suffered in September 2001 was not the cause of her persisting chest pain, and that she could return to work in the light work category and possibly the medium work category. (AR. 268-69)

In relation to Curran's worker's compensation claim, depositions were also taken of Dr. Anderson, Dr. Russell, and Dr. Golliher in 2004. (AR. 288-307, 308-31, 332-45) The transcripts of these depositions describe a surveillance videotape taken of Curran that is not in the record but is referenced by both parties to this action and the ALJ. (AR. 292, 295, 316) The videotape evidently showed Curran during the week of April 17 through April 23 of 2003. (AR. 316) For approximately two to two and one-half hours each day, she was recorded picking up groceries and doing errands around town. (AR. 316) She was also recorded on tape pulling a cooler to a lake. (AR. 339) Dr. Anderson's deposition indicates that Curran can be seen picking up and moving a heavy bag of dog food without exhibiting signs of pain. (AR. 292) The significance of the videotape was disputed by the doctors who were

6

deposed.  Dr. Anderson, the independent examiner, indicated that the actions
Curran exhibited on the videotape were inconsistent with the pain she was
reporting. (AR. 295)  Dr. Russell, Curran's pain specialist, indicated that he did
not believe that the actions of Curran were surprising or inconsistent because
of the waxing and waning nature of her reported pain.  (AR. 316)

On April 20, 2004, Curran began seeing Dr. Caroline Capitano.  Prior to
her visit, Curran filled out an initial pain assessment. (AR. 237-42)  Curran
indicated that she was suffering from chronic costochondritis and severe
neuritis.  (AR. 237)  Dr. Capitano noted that the intensity of Curran's reported
pain had increased over the years.  (AR. 234)  Dr. Capitano ordered a chest x-
ray which showed a posterior sublaxation of ribs 8 through 11. (AR. 234)
Dr. Russell testified that the sublaxation Dr. Capitano found was essentially a
stretching of the area where the ribs join the spine.  (AR. 318)  Dr. Capitano
continued to see Curran through June of 2004, attempting a number of
procedures to properly reposition Curran's ribs, none of which had a significant
effect on Curran's pain levels. (AR. 279-87)

Residual functional capacity (RFC) assessments were conducted in
March and June of 2004. (AR. 118-34)  In the March assessment, the agency
physician found that Curran could occasionally lift 10 pounds, stand or walk
for 4 hours in an 8-hour work day, sit for about 6 hours in an 8-hour workday,
and had unlimited capacity to push or pull within the 10-pound lifting limit.

(AR. 127)  The physician also found that Curran could occasionally climb stairs or ladders, and occasionally kneel, stoop, crouch, and crawl. (AR. 128)

In the June assessment, the agency physician found that Curran could frequently lift 10 pounds, stand or walk for 2 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, and had unlimited capacity to push or pull within the 10-pound limit.  (AR. 119)  The physician found that she could frequently climb stairs, kneel, and crouch, as well as occasionally climb ladders, stoop, and crawl. (AR. 120)

At the ALJ hearing on March 22, 2005, Curran testified that she lived with her ten-year-old son, who is "pretty self-sufficient."  (AR. 389, 402)  She stated that she experienced pain in "[t]he whole chest area, [and] the back." (AR. 392-93)  Curran testified that she took Stadol, Baclofan, Ibuprofen, and Trazodone, but that she rarely took Stadol because it was a very strong medication and she got nauseous when she took it.  (AR. 394-95)  She also stated that she took Trazodone nearly every night to help her sleep.  (AR. 395)

Curran testified that she could take care of her personal hygiene requirements alone, but she did receive some assistance around the house from her son and some help getting groceries from her son's father.  (AR. 398)

She stated that she had not been sleeping well, waking up at 3 o'clock and 4 o'clock in the morning. (AR 400)  On a typical day, she wakes up and helps send her son off to school, and then spends a lot of the day lying down to

8

ease the pain, performing household tasks between her rest periods.  (AR. 400-02)  She stated that she usually could not sit for longer than an hour without lying down.  (AR. 403)

James Fortune, a vocational expert, testified via telephone before the ALJ.  (AR 410-15)  In response to a hypothetical question regarding an individual who had the characteristics found by the agency's consultive physicians in the RFC assessment, Fortune testified that a similar hypothetical individual could do the work of a night auditor.  (AR 411-12)  Further, Fortune listed a number of other sedentary positions that could be held by such a hypothetical person, including positions as a telephone operator, a customer service representative, and a credit checker.  (AR 412-13)  Fortune then testified that if the hypothetical person had to lie down in order to relieve pain or discomfort two or more times a day for more than an hour and one-half, that person would effectively be out of the job market.  (AR 413)

## ALJ DECISION

On May 16, 2005, ALJ Larry M. Donovan issued his decision.  After applying the sequential five-step evaluation process,[2] the ALJ concluded

---

[2]The five-step sequential analysis as outlined by the Eighth Circuit is: (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether

that Curran was not entitled to benefits.

First, the ALJ determined that Curran was not engaged in substantial gainful activity.  Second, the ALJ found that Curran suffered from the medically determinable impairment of costochondritis and that the impairment was severe.  Third, the ALJ found that the impairment did not meet or equal the Listing of Impairments at 20 C.F.R. Pt. 404, Subpt. P, appendix 1.

Fourth, the ALJ determined Curran's RFC by reviewing medical records, testimony of witnesses, and testimony of Curran.  With regard to Curran's personal statements, the ALJ found that they were "not entirely credible in light of the medical evidence and the discrepancies between the claimant's assertions and the information contained in the documentary reports."  The ALJ listed seven discrepancies in the record to justify his credibility determination.  After discrediting Curran's testimony, the ALJ found that she had an RFC roughly equivalent to that found in the RFC assessments, which were not inconsistent with her medical records.

In accordance with Step 4, the ALJ then analyzed Curran's ability to perform her past work.  The ALJ determined that she would be unable to work as a saw mill worker, a nurse's assistant, a cook, a convenience store worker,

---

the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.  Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998).

or a motel clerk.  The ALJ did, however, find in accordance with the testimony of the vocational expert, that Curran would be able to return to her prior work as a hotel night auditor, a position that requires only a sedentary exertion level.

Further, the ALJ found that there were a significant number of other jobs that a hypothetical worker with Curran's skills could perform in accordance with Step 5.  The ALJ found that these jobs include working as a telephone operator, a customer service representative, and a credit checker.

The ALJ concluded that Curran still had the capacity to work in a variety of positions, and was therefore not under a disability as defined in the Social Security Act.

## STANDARD OF REVIEW

The decision of the ALJ must be upheld if it is supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); Metz v. Shalala, 49 F.3d 374, 376 (8th Cir. 1995).  Substantial evidence is less than a preponderance but enough evidence that a reasonable mind might find it adequate to support the conclusion.  Fines v. Apfel, 149 F.3d 893 (8th Cir. 1998); Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995); Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).  Review by this court extends beyond a limited search for the existence of evidence supporting the Commissioner's decision to include giving consideration to evidence in the record which fairly detracts from the decision.  Brockman v. Sullivan, 987 F.2d

11

1344, 1346 (8th Cir. 1993); Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Turley v. Sullivan, 939 F.2d 524, 528 (8th Cir. 1991).

Under section 405(g), the court is to determine whether there is substantial evidence in the record as a whole to support the decision of the Commissioner and not to reweigh the evidence or try the issues de novo. Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Furthermore, a reviewing court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). See also Smith v. Shalala, 987 F.2d at 1374. The court must review the Commissioner's decision to determine if an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); Nettles v. Schweiker, 714 F.2d 833, 836 (8th Cir. 1983). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. Smith v. Sullivan, 982 F.2d at 311; Satterfield v. Mathews, 483 F. Supp. 20, 22 (E.D. Ark. 1979), aff'd per curiam, 615 F.2d 1288, 1289 (8th Cir. 1980). If the ALJ's decision is supported by substantial evidence, then this court cannot reverse the decision of the ALJ even if the court would have decided it differently. Smith v. Shalala, 987 F.2d at 1374.

## DISCUSSION

Curran claims that the ALJ's credibility determination was not supported by substantial evidence, and therefore, the ALJ improperly failed to consider

her testimony in determining her RFC at Step 4.[3]  As a result of this alleged error, Curran believes her disability claim was erroneously denied.

An "ALJ may not disregard a claimant's subjective complaints of pain solely because there exists no evidence in support of such complaints." Simonson v. Schweiker, 699 F.2d 426 (8th Cir. 1983).  "[A]n ALJ may disbelieve a claimant's subjective reports of pain because of inherent inconsistences or other circumstances." Eichelberger v. Barnhart, 390 F.3d 584 (8th Cir. 2004).  If the ALJ finds such inconsistencies, the ALJ must expressly make a credibility determination and set forth the reasons for the determination. Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004).

In this case, the ALJ explicitly set forth seven inconsistencies in the record which caused him to find Curran not credible.  Curran argues that each of the ALJ's stated inconsistencies are invalid, and therefore, do not provide "substantial evidence" for the credibility determination.  As discussed below, although Curran is correct in arguing some of the ALJ's bases are insufficient, when taken as a whole, the court concludes that the ALJ provided sufficient

---

[3] On appeal, Curran does not argue that the ALJ improperly applied the Polaski factors in assessing her subjective complaints of pain.  Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).  The ALJ noted these factors in his ruling, and considered them in determining Curran's RFC.  See Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (While an ALJ need not methodically discuss each Polaski factor, the factors must be acknowledged and examined).

justification for his credibility determination.  Because sufficient evidence in the record as a whole supports the determination, the decision is affirmed.

**1.      Factual Bases for the ALJ's Credibility Determination**

The ALJ found Curran's testimony not credible based upon the following seven inconsistencies:  (A) Curran's testimony that she had pain in the "whole chest and back" was inconsistent with the record; (B) Curran's testimony that she was having difficulty sleeping due to pain was inconsistent with the record; (C) Curran's testimony regarding nausea as a side effect of medication was inconsistent with the record; (D) the lack of medical opinion corroborating Curran's claims of debilitating pain negatively impacted her credibility; (E) Curran's ability to care for her child was inconsistent with her claims of pain; (F) Curran's testimony that she spent a vast amount of time lying down was inconsistent with no physical evidence of muscular atrophy and surveillance footage showing her performing errands and going to the lake; and (G) Curran's discontinuation of visits with pain specialist Dr. Russell was inconsistent with her continued complaints of pain.

**A.  Curran's Testimony Not Supported by the Record**

Three of the bases cited by the ALJ in his credibility determination were based upon inconsistencies between Curran's testimony at the hearing and her previous allegations of pain to her treating physicians.  "Where the record is inconsistent with an individual's subjective complaints of pain, the ALJ may

14

properly discount them." McKinney v. Apfel, 228 F.3d 860, 864 (8th Cir. 2000) (citing Polaski, 739 F.2d at 1322).  A review of the record indicates that the portions of Curran's testimony cited by the ALJ are inconsistent with the record as a whole, and therefore provide support for his credibility determination.

The ALJ found that Curran's claims of pain in the "whole chest and back" were not corroborated by the record, and specifically by the April 2004 pain assessment.  While it is unclear if Curran reported any back pain on that particular pain assessment, it is clear that what was reported was limited primarily to the left side of her chest and perhaps pain that spread to her back. (AR. 234).  It appears from a broader view of the record that the areas where Curran did report pain spread since her initial injury reported in 2001; however, the focus of the pain remained on the upper chest, and some pain on the back. (AR. 226)  Thus, substantial evidence exists to justify the ALJ's finding that Curran's statement that pain was on her "whole chest and back" was an overstatement and inconsistent with the record as a whole.

Further, the ALJ found that Curran's testimony regarding sleep difficulty was inconsistent with Dr. Capitano's initial pain evaluation where she noted that "[Curran] has not had any sleep disturbance [because] of the pain." (AR. 234)  The ALJ also noted that prior medical records do not indicate sleep difficulties.  Curran argues that her testimony regarding sleep difficulty is

consistent with the fact that she was taking Trazadone, a sleep aid.  The fact that Curran was taking a sleep aid does not, however, explain why the first significant recorded complaints of sleep difficulty were made during her testimony before the ALJ. (AR. 400-01)  Substantial evidence exists for the ALJ's finding that Curran's testimony of significant sleep disturbances was inconsistent with the record as a whole.

The ALJ also found that Curran's testimony regarding severe nausea as a side effect of taking the drug Stadol was inconsistent with the record.  In May of 2004, Curran indicated that she had stopped taking Stadol because it "did not help with her pain and gave her unacceptable psychological side effects." (AR. 233)  Additionally, Curran's statement filed with her request for an ALJ hearing did not list Stadol as one of her current medications. (AR. 115)  At the hearing, however, Curran indicated she took it as often as once a week. (AR. 395)  Again, there was substantial evidence to support the ALJ's finding Curran's testimony was inconsistent.

These three instances cited by the ALJ do tend to indicate that the testimony Curran gave before the ALJ was inconsistent with her medical records and previous statements that she had made to her care providers.  "If there are inconsistencies in the evidence as a whole, an ALJ is permitted to disbelieve a claimant's subjective complaints." <u>Cruse v. Bowen</u>, 867 F.2d 1183

16

(8th Cir. 1989).  Therefore, these instances are proper grounds for the ALJ to discredit Curran's testimony.

### B.  Lack of Medical Opinion Corroborating Curran's Complaints

The ALJ found that "[t]he record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than determined in this opinion." (AR. 21) Although Simonson, 699 F.2d at 429, held that an ALJ should not discredit a plaintiff's complaints of pain **solely** because they are not supported by medical evidence, it did not hold that such evidence is irrelevant to a credibility determination.

The simple fact is that nowhere in the record do Curran's treating or examining physicians indicate that she is unable to work on a long-term basis because of her pain.  Curran argues that because none of the physicians who examined her stated that she was "malingering or overstating" her pain, her claims of disability are supported.  "The mere fact that working may cause pain or discomfort does not mandate a finding of disability."  Cruse, 867 F.2d at 1186.  See also Tennant v. Apfel, 224 F.3d 869, 870 (8th Cir. 2000) ("In discrediting [claimant], the ALJ properly relied on his poor work record, the absence of physician-ordered limitations, and the lack of objective medical evidence.")  The ALJ properly found that the lack of medical opinion in the record could adversely affect Curran's credibility.

**C.  Daily Activity and Lack of Muscle Atrophy**

The ALJ also found that Curran's daily activities were inconsistent with her claims of pain.  The ALJ referred to the activity of Curran captured on videotape, namely shopping for groceries and going to the lake, as well as her ability to take care of her child.

Curran is correct in asserting that in the Eighth Circuit, "the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a Claimant can perform full and competitive work." Hogg v. Shalala, 45 F.3d 276 (8th Cir. 1995).  Accordingly, the ALJ erred in determining that Curran's ability to occasionally shop for groceries and care for her ten-year-old child whom she characterizes as "pretty self-sufficient" adversely affects her credibility.  The ALJ also pointed to Curran's pulling a cooler on a visit to the lake as inconsistent with her alleged pain.  The medical records, especially those contemporaneous to the videotape, indicate that Curran's condition waxed and waned, and the ability to make occasional trips to the lake is not inconsistent with this condition.  Therefore, Curran's limited daily activities were not a valid reason to discredit her testimony.  The lack of muscle atrophy, however, is a valid reason to discredit her testimony.

**D.  Discontinuation of Visits to Dr. Russell**

The ALJ found that Curran's discontinuation of visits to Dr. Russell, her pain specialist, was inconsistent with her continued allegations of pain.  The

Commissioner conceded that although Curran did not return to Dr. Russell subsequent to January 2004, she did continue to receive medical care, and therefore, this was not a proper basis for the ALJ to discredit her testimony.

**2.     Discussion of the Ultimate Decision of the ALJ**

As discussed above, the court concludes that the ALJ was reasonable in his decision to discredit Curran's testimony based upon inconsistencies in the record, lack of muscle atrophy, and the lack of any corroborating objective evidence.  Curran cites three cases she argues are applicable to the facts of this case and support a decision in her favor.

Curran first cites Baumgarten v. Chater, 75 F.3d 366 (8th Cir. 1996), for the proposition that when an ALJ bases a credibility determination on factors not supported by the record, that undermines the credibility determination.  In Baumgarten, the ALJ found that testimony regarding a variety of physical problems suffered by claimant was not supported by the record.  Id. at 368-69. The court found that in fact the claimant's complaints, including headaches, swollen fingers, and difficulty sleeping, were in fact all present in the record. Id.  Accordingly, the court found the credibility determination invalid.  As discussed above, a review of the record in this case supports the ALJ's findings of inconsistencies, and therefore Baumgarten is not controlling.

Curran next cites Holmstrom v. Massanari, 270 F.3d 715 (8th Cir. 2001), for the proposition that when the record as a whole corroborates the subjective

complaints of a complainant, any inconsistencies are overshadowed.  In Holmstrom, the complainant's allegations of pain were supported by x-rays, CT scans, and MRIs that showed significant physical impairments in his lower back.  Id. at 718.  Here, similar medical evidence does not exist to corroborate Curran's pain.  Additionally, the only statement made by Curran's physicians corroborating her pain is that she is not "malingering."  There is not sufficient corroboration in the record to negate the inconsistencies discussed above, and Holmstrom is not controlling.

Finally, Curran cites O'Donnell v. Barnhart, 318 F.3d 811, 817 (8th Cir. 2003), for the proposition that consistent complaints of pain, coupled with attempting a wide range of treatments, serves as an "objective medical fact." While the comparison to O'Donnell is perhaps the most relevant of Curran's citations, it still falls short based upon two important factual distinctions. First, in O'Donnell there was "objective medical evidence" supporting some of the claimant's allegations of pain, including an MRI examination that showed advanced degenerative changes in the claimant's spine. Id. at 816-17.  Here, an MRI, X-ray, CT scan, and bone scan were all performed and provided no explanation for the complained-of chest pain.  The only objective evidence found to support Curran's pain was the slight posterior displacement of three of Curran's ribs, which were adjusted by Dr. Capitano, and still did not result in relief of Curran's alleged pain.

Second, the claimant in O'Donnell had a fourteen-year history of working at a well paying job, which bolstered her credibility.  Id. at 817  See Jenkins v. Apfel, 196 F.3d 922, 926 (8th Cir. 1999) ("[Claimaint's] claims of disabling pain are also supported by his history of past hard work").  Curran has never held a job for more than three years.

O'Donnell is further distinguishable in that in reviewing the ALJ's decision, the court was presented with new and material evidence submitted to the Appeals Council, but not reviewed by the ALJ.  O'Donnell, 318 F.3d at 816. The court in O'Donnell also found that the ALJ erred in giving the opinions of claimant's doctor "no weight."  Id. at 818.  No similar offers of proof, or allegations, have been made in the instant case.

"The ALJ is in the best position to gauge the credibility of testimony and is granted deference in that regard."  Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).  This court will "not disturb the decision of an ALJ who considers, but for good cause expressly discredits, a claimant's subjective complaints of pain."  Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999).  In this case, the court finds that the ALJ did discredit Curran's allegations of pain for good cause, and therefore will not disturb that finding.  Because the credibility determination is the sole issue Curran raises on appeal, the court affirms the decision of the ALJ.

## CONCLUSION

The ALJ in this case expressly discredited Curran's subjective allegations of pain and subsequent disability.  This finding is supported by substantial evidence in the record. The ALJ's decision to deny disability insurance benefits was proper, because without Curran's subjective allegations, the record indicates that she is not disabled under the Act.  Accordingly, it is hereby

ORDERED that the Commissioner of Social Security's decision denying Teresa Curran's claim for disability insurance benefits under Title II of the Social Security Act is affirmed.

Dated August 23, 2006.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE

22